STATE OF NORTH CAROLINA v. JOSEPH TIMOTHY KEEL

No. 134A93

(Filed 9 September 1994)

### 1. Jury § 226 (NCI4th)— first-degree murder—jury selection—death qualification—opportunity to rehabilitate

The trial court not err in a first-degree murder prosecution by allowing the State's challenges for cause of prospective jurors on the basis of their opposition to capital punishment without first giving the defendant an opportunity to attempt to rehabilitate where each of the excused jurors unequivocally stated that he or she was opposed to the death penalty and could not vote for its imposition and the defendant has shown nothing tending to indicate that further questioning was likely to have produced any different answers.

**Am Jur 2d, Jury § 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

### 2. Criminal Law § 874 (NCI4th)— first-degree murder—reinstruction on elements—"sixth" element omitted—no plain error

There was no plain error in a first-degree murder prosecution where the trial court's initial instruction on the elements of first-degree murder included the sixth element that defendant did not act in self-defense or was the aggressor, the jury returned and asked the court to restate the six requirements, the court reinstructed the jury according to its original instruction but omitted the sixth element, the jury indicated that its request had been answered, the jury continued its deliberations and returned with a guilty verdict, and the court subsequently made findings that it had only instructed the jury on the first five requirements and that counsel had indicated in court that there was nothing further and had later informed the court in chambers that he had not wanted the court to instruct on the sixth requirement. Assuming that the evidence raised an issue of self-defense and required an initial instruction on that defense, the failure of the trial court to reinstruct on this matter in response to the jury's inquiry was not plain error because the jurors indicated that the trial court's

STATE v. KEEL

[337 N.C. 469 (1994)]

response answered their question and was a sufficient response, despite the fact that their question clearly indicated that they were aware that the initial instruction had included a sixth "requirement" for conviction in the present case, leading to the conclusion that the jury was concerned with some matter involving one of the elements of the crime of first-degree murder and not with any issue of self-defense. Moreover, defendant's own evidence indicates that the trial court's failure to reinstruct the jury concerning absence of self-defense had no effect on the jury.

**Am Jur 2d, Trial §§ 1108 et seq.**

3. **Homicide § 230 (NCI4th)— first-degree murder—sufficiency of evidence**

There was sufficient evidence of first-degree murder where the evidence presented at trial would support inferences and findings to the effect that the defendant plotted to kill his father-in-law; lured the victim to a farm on a pretext; shot him twice causing his death; and thereafter made every effort possible to conceal his crime by giving various contrived versions of what had occurred and by concealing or destroying physical evidence that the crime had been committed.

**Am Jur 2d, Homicide §§ 425 et seq.**

4. **Criminal Law § 1337 (NCI4th)— first-degree murder—sentencing—aggravating circumstance—prior conviction for involuntary manslaughter**

The trial court did not err in a capital sentencing procedure by allowing the jury to consider defendant's previous conviction for involuntary manslaughter as the basis for the sole aggravating circumstance of a previous conviction of a felony involving the use or threat of violence to a person. Although defendant argued that involuntary manslaughter is by definition an unintentional killing and that the General Assembly intended to make only intentional crimes of violence aggravating circumstances, nothing in the wording of the statute hints at a legislative intent that the prior felony conviction must have involved such an intentional use or a threat of violence to another person. The prior felony conviction can be either for a felony which has as an element the use or threat of violence to the person, or a felony which does not have the use or threat of violence as an element but which is committed with the use or threat of violence. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 598, 599.**

STATE v. KEEL

[337 N.C. 469 (1994)]

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

5. **Criminal Law § 1337 (NCI4th)— first-degree murder—sentencing—aggravating circumstances—prior felony involving violence—requested instruction on violence**

   The trial court did not err at a capital sentencing proceeding by declining to give defendant's requested instruction on the aggravating circumstance of a prior felony involving violence that ". . . violence is the use of extreme force with the intent to inflict harm or destruction."

   **Am Jur 2d, Criminal Law §§ 598, 599.**

   **Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

6. **Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing—definition of aggravating circumstances**

   The definition of aggravating circumstance created by N.C.G.S. § 15A-2000(e) is not vague and overbroad.

   **Am Jur 2d, Trial §§ 1441 et seq.**

7. **Criminal Law § 1348 (NCI4th)— first-degree murder—sentencing—definition of mitigating circumstances**

   The trial court did not err in a capital sentencing proceeding by failing to give defendant's requested instruction defining mitigating circumstances and directing the jurors that they could properly base their sentencing recommendation upon any sympathy they might have for defendant. The instruction given by the court, in context, clearly informed the jurors that they could consider any circumstance, including sympathy for the defendant, which they found to arise from the evidence and deemed to have mitigating value.

   **Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**8. Constitutional Law § 370 (NCI4th); Criminal Law § 1333 (NCI4th)— first-degree murder—sentencing—issues and recommendation sheet—weighing aggravating and mitigating circumstances**

The trial court's use of the issues and recommendation sheet in a capital sentencing proceeding did not violate the cruel and unusual punishment clause in the Eighth Amendment and deny defendant due process where defendant argued that the language is defective because it allows a jury to recommend death if it finds that the mitigating circumstances are of equal weight and value to the aggravating circumstances found, but that argument has been previously rejected.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**9. Constitutional Law § 370 (NCI4th); Criminal Law § 1351 (NCI4th)— first-degree murder—sentencing—instructions—mitigating circumstances—burden of proof**

A defendant in a capital sentencing proceeding was not deprived of his right to be free from cruel and unusual punishment where the court instructed the jury that the defendant had the burden of proving mitigating circumstances by a preponderance of the evidence.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**10. Criminal Law § 1349 (NCI4th)— first-degree murder—sentencing—instructions—consideration of mitigating circumstances**

The trial court did not err in a capital sentencing proceeding in the issues contained on the Issues and Recommendation as to Punishment Form where the jury instructions were strictly in accord with the Pattern Jury Instructions as amended to conform to the dictates of *McKoy v. North Carolina*, 494 U.S. 433; the instructions given expressly state that any single juror may find that a nonstatutory mitigating circumstance exists and may deem

it to have mitigating value; the Issues and Recommendation as to Punishment Form used by the trial court, together with the trial court's instructions in their entirety during the capital sentencing proceeding, emphasized that each juror was to consider and give weight to all evidence that juror found to be mitigating; and the Supreme Court was convinced that each juror was permitted to and did consider all of the mitigating evidence he or she found to exist.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**11. Constitutional Law § 370 (NCI4th)— death penalty—jury discretion—not unconstitutional**

The North Carolina death penalty statute is not facially unconstitutional because jury discretion is not guided appropriately by objective standards. N.C.G.S. § 15A-2000.

**Am Jur 2d, Criminal Law § 628.**

**12. Criminal Law § 1373 (NCI4th)— first-degree murder—death sentence—not disproportionate**

A sentence of death for first-degree murder was upheld where the record fully supports the aggravating circumstances found by the jury; there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration; and the sentence of death was not disproportionate. The fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have consistently returned life sentences in factually similar cases. N.C.G.S. § 15A-2000(d)(2).

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Brown, J., on 30 March 1993

in Superior Court, Edgecombe County, upon a jury verdict finding the defendant guilty of murder in the first degree. Heard in the Supreme Court on 11 April 1994.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Thomas R. Sallenger for the defendant-appellant.*

MITCHELL, Justice.

This is the second time this case has been before this Court on appeal. The defendant was initially tried at the 12 August 1991 Criminal Session of Superior Court, Edgecombe County, at which time he was convicted of murder in the first degree and sentenced to death. Concluding that the trial court had committed prejudicial error, this Court held that the defendant must receive a new trial. *State v. Keel*, 333 N.C. 52, 423 S.E.2d 458 (1992).

The defendant was again tried capitally during the 5 March 1993 Criminal Session of Superior Court, Edgecombe County, for murder in the first degree. The jury returned a verdict finding the defendant guilty of that crime. At the conclusion of a separate capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death. On 30 March 1993, the trial court entered judgment sentencing the defendant to death. Thereafter, the defendant gave notice of this appeal of right, which we now undertake to review.

Some of the State's evidence introduced during the guilt-innocence determination phase of the defendant's second capital trial in this case tended to show the following. At approximately 10:00 p.m. on 10 July 1990, the defendant Joseph Timothy Keel knocked on the door of Aubrey Thurman's mobile home. When Thurman answered the door, the defendant told him that John Simmons, the defendant's father-in-law, had been shot. Aubrey Thurman testified that the defendant's shirt was covered with blood. Simmons was outside the Thurman mobile home seated in the center of the seat of a small truck and positioned so that he faced the steering wheel. Aubrey Thurman never detected any movement on the part of Simmons. Aubrey Thurman's wife Shelby called the 911 emergency services telephone number immediately. Shelby Thurman testified that the defendant told her that Simmons had been shot in a drive-by shooting on Gay Road by a person in a station wagon.

Edgecombe County Deputy Sheriff Bob Davis testified that he was called to Baker's Park, where the Thurmans' mobile home was located, on the night of 10 July 1990. When he arrived, the defendant met him at the front door of the Thurmans' mobile home. The defendant told Davis that he had received a phone call earlier in the evening asking him to go to Shell Bank Farm, the hog farm where the defendant was employed. The defendant said that Simmons had driven him to the farm. On the way back from the farm, while Simmons was driving, someone in a station wagon had shot Simmons near the intersection of Leggett Road and Gay Road. Deputy Davis examined the truck the defendant and Simmons had been using and found that the windows were rolled down and intact. There was a bullet hole on the driver's side of the truck in the cab section and what appeared to be an exit hole made by a bullet on the interior of the truck. A pool of blood was located near the center of the seat of the truck toward the passenger side.

Sergeant Donnie Lynn of the Edgecombe County Sheriff's Department also interviewed the defendant on the night of the shooting. The defendant stated that he and his wife lived with his wife's father, Johnny Simmons. The defendant told Sergeant Lynn that on the night of the shooting, Simmons had driven the defendant to Shell Bank Farm after the defendant's boss had called to tell him to check on the hogs. The defendant stated that he had taken the company truck from the driveway of the farm manager's house and had driven that truck to the farm while Simmons followed in the small pick-up truck. After attending to business at the hog farm, the defendant left the company truck there and rode with Simmons. When they were on Gay Road near some trash dumpsters, a car passed them and the defendant heard two pops. Simmons slumped over, and the defendant then managed to stop the truck. The defendant moved Simmons over to the passenger's side of the truck and drove away.

On the night of the shooting, the defendant showed Sergeant Lynn the locations where the events he had described allegedly occurred. Sergeant Lynn testified that he found nothing in the vicinity of the Gay Road dumpsters to indicate that a drive-by shooting had occurred. Lynn testified that he returned to the farm the following day and noticed what appeared to be blood outside the farm office. He found a fired .22 caliber shell casing nearby. Inside the building, Sergeant Lynn saw blood spattered on the walls and floors and found a jumpsuit which bore blood stains. He also found a bloody mop and

two boxes of .22 caliber shells, as well as some loose shells in a drawer in the office.

Dr. Louis Levy, Medical Examiner for Edgecombe County, testified that Simmons had suffered two gunshot wounds to the head. One wound was in the right malar region and the other was behind the left ear. Both were entrance wounds. Dr. Levy testified that the cause of John Simmons' death was shock resulting from these gunshot wounds.

Dr. Levy testified that, in addition to the gunshot wounds, the victim had suffered bruises and abrasions of the lips, nose and forehead. He had also suffered a blunt force injury beginning at the right eyebrow and extending upward. The victim also had suffered abrasions on his left side and hemorrhaging to his buttocks and both legs. His body also bore a figure-eight shaped lesion over the left knee.

Dr. Levy testified that the victim could not have received both gunshot wounds from the same side, since the paths of the wounds entered on opposite sides of the head. Dr. Levy opined that this configuration of wounds was inconsistent with a drive-by shooting. On cross-examination, he testified that the wounds were consistent with a .22 caliber bullet, and that the victim was alive at the time both of the wounds were inflicted.

Gary Stanbough, the manager of Shell Bank Farm, testified that he spoke by telephone with the defendant at approximately 8:00 p.m. on 10 July 1990. The defendant asked for permission to go fishing in a pond at the farm. The defendant stated that he wanted to know if he could come by to get the farm truck to drive to the pond. Stanbough allowed the defendant to borrow the truck. Stanbough testified that a single-shot .22 caliber rifle was kept behind the seat of the farm truck, but that he never saw the rifle again after the defendant borrowed the truck that night.

James Stevey, an employee of the farm, testified that he went to work on the day after the shooting. The key that was usually over the front door of the office building at the farm was missing. Stevey was able to enter the building only after the defendant entered by a side door and opened the front door from inside. Stevey had noticed a puddle of blood in front of the building and saw the defendant kick dirt over the puddle. Once they were inside the building, the defendant went ahead of Stevey into the area of the building in which workers change their clothes. By the time Stevey entered, the defendant

was already running the washing machine. Stevey had never seen the defendant run the machine before. The defendant then began wiping blood off the floor with a rag. The defendant said that his father-in-law had been shot but did not admit to Stevey that he had shot the victim.

Lieutenant Jerry Wiggs of the Edgecombe County Sheriff's Department testified that he interviewed the defendant on 13 July 1990—three days after the shooting—at the office of the sheriff's department. After being advised of and waiving his constitutional rights, the defendant made a statement which Wiggs wrote down and which was signed by the defendant. In his statement, the defendant admitted that he had shot the victim at the hog farm on 10 July 1990. He stated that he had asked Simmons for a ride to the farm. When they arrived at the farm, the defendant picked up the farm truck. He then proceeded to the farm building, driving ahead of Simmons. The defendant went into the farm building upon his arrival. When Simmons drove up outside the building, the defendant was inside the building and fired a shot into the cab of Simmons' truck. Simmons got out of the truck, saying that he was hit. The defendant told him to sit down in the kitchen area of the farm building. The defendant stated that he then shot Simmons again, because Simmons had a knife and was coming after him. The defendant said that Simmons fell, but got up again, and the defendant then helped him into the truck. The defendant then drove to the Thurmans' mobile home for help. The defendant stated that he had thrown the rifle he used to shoot the victim into a hog pen. He stated that he did not know why he had shot Simmons the first time.

Cecila Edmondson, the defendant's next door neighbor, testified that on 9 July 1990—the day before the victim was shot—the defendant was standing outside her house. She overheard the defendant state that he was going to kill "the bull-headed mother f---ing son of a bitch." Edmondson testified that the victim and the defendant had been arguing before she heard the defendant make that statement.

The defendant introduced evidence tending to show the following. On the evening of 10 July 1990, John Simmons told the defendant that he had received a telephone call telling the defendant to go to work. Simmons drove the defendant to Gary Stanbough's house to get the farm truck. The defendant then drove the farm truck from Stanbough's house to the area in which the farm office was located. Upon arrival, the defendant went into the office and came back out.

The defendant and Simmons began to discuss prior arguing that had occurred between the defendant and John Simmons' wife and his daughter, Amy. Simmons told the defendant that the defendant and Amy needed to find another place to live. Simmons and the defendant then engaged in a fist fight. Simmons ran into the office, where the two men began pushing each other. The defendant told Simmons that he wished that Simmons would stop accusing him of "messing" with Simmons' wife, Jennifer. The two men began fighting again, and the defendant kicked Simmons on his knee and in his chest. Simmons fell and hit a counter in the kitchen area of the office. When he got up he had blood on his hand.

Simmons picked up a knife from the counter and pushed the defendant. The defendant fell over some chairs and against a refrigerator. The defendant then pulled out a .25 caliber pistol and told Simmons to stop. The defendant fired the pistol one time, hitting Simmons and knocking him down. The defendant then went to assist Simmons. He drove Simmons' truck to the front of the office and put Simmons inside. The defendant then pulled the truck up to a window of the office. He went back to the farm truck and took out the rifle. He went into the office and fired a shot through the window into Simmons' head as Simmons was sitting in the truck slumped over. The defendant took mops from the office and cleaned the blood off the floor. Then he drove Simmons to the Thurmans' mobile home where he tried to assist emergency personnel upon their arrival.

The defendant also introduced evidence tending to show that he had been drinking and using cocaine on the evening of the killing. His brother and sister-in-law testified that he smelled of alcohol and was crying shortly after the shooting. The defendant testified that he did not intend to kill or hurt Simmons.

After arguments of counsel and instructions by the trial court, the jury returned a verdict finding the defendant guilty of murder in the first degree. Thereafter, the trial court conducted a separate capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000.

During the sentencing proceeding, the State expressly relied on the evidence previously introduced and also presented additional evidence. The State introduced a certified record of a conviction of the defendant on 20 March 1987 for the offense of involuntary manslaughter. Dr. George C. Hemingway, a pediatrician and Medical Examiner for Edgecombe County, testified that at approximately 5:00 a.m. on 26 June 1986, he examined an eleven-month-old infant named Victor

Matthew Keel at the emergency room at Heritage Hospital. Dr. Hemingway observed bruises about the child's head, face, legs and arms. The bruises were relatively recent bruises, six to eight hours old.

Dr. Louis Levy testified that he performed an autopsy on the body of the child Victor Keel on 26 June 1986 and found a three-inch fracture of the skull located on the right side of the head. In Dr. Levy's opinion, that injury caused the child's death.

The defendant also presented evidence during the sentencing proceeding. The defendant testified that when he had been in prison, he had been president of the prison Jaycee Club and had helped organize functions to raise money for the prison and to help people in the community. He testified that he participated in a wood drive during which inmates would get together to go out of the prison and cut and split wood to provide for those who did not have firewood. He also testified that he had started a choir in Granville County, completed his high school education, obtained an associate degree from Heritage Bible College and had enrolled in and completed drug and alcohol abuse classes.

The defendant testified that he did not intentionally kill his eleven-month-old son. He testified, in fact, that his son had injured himself by falling down the front steps of the defendant's mobile home. The defendant testified that his son had also received a bruise on his forehead when he hit a door at his grandmother's house on the date of his death. The defendant said that when he had learned that his son had breathing trouble, he attempted to get help. When his son again stopped breathing, the defendant attempted to revive the child. The defendant acknowledged that he was an alcoholic and had blacked out in the past.

The defendant also offered evidence through his parents and brother to the effect that the defendant's son had struck his head on a door on the day of his death. The defendant's mother testified that he had lost interest in school when he had been taken off the wrestling team. She also testified that he had sought treatment for alcohol abuse. The defendant's brother testified that once when he was twelve years old, he and the defendant were walking in a field and saw some wild dogs coming their way. The defendant grabbed him by the arm and got him up a tree until the dogs left.

Dr. Jonathan Weiner, an expert in forensic psychiatry, testified that he had diagnosed the defendant as being dependent on alcohol

and marijuana. Dr. Weiner felt that he was probably dependent on cocaine as well. Dr. Weiner testified that from the time the defendant was young, he had problems dealing with feelings and impulses. When he was young, the defendant dealt with problems with people by fighting. Dr. Weiner further diagnosed the defendant as having a borderline personality disorder in that he never was able to come to a sense of who he was. Dr. Weiner testified that the defendant had a history of alcoholism in his family. In an earlier part of his life, the defendant had thought about hurting himself. During one episode when he was in a drug treatment program and withdrawing from drugs, the defendant cut himself with a razor blade. Dr. Weiner testified that the defendant seemed to function better in a prison environment than outside of prison because he did not have access to alcohol and drugs in prison.

Lane B. Simpson, a pastor, testified that he met the defendant when the defendant's child died. Simpson testified that the defendant had accepted the Lord while in jail and wanted to be a fine Christian young man.

John College testified that he was the defendant's direct supervisor at Shell Bank Farm for approximately six months. The defendant was a good worker.

Dr. Robert L. Conder, Jr., an expert in the field of neuropsychology, testified that he examined the defendant, took a history from the defendant and administered a battery of tests to him. Dr. Conder testified that the defendant was in the borderline area between low-average IQ and mild mental retardation. The defendant's IQ is 78 and his intellectual functioning in the lower seven percent of the population. Dr. Conder diagnosed the defendant as having an organic personality syndrome.

At the conclusion of all evidence at the capital sentencing proceeding, and after arguments of counsel and instructions by the trial court, the jury recommended that the defendant be sentenced to death. The trial court entered judgment sentencing the defendant to death, and the defendant gave notice of appeal to this Court.

[1] In his first assignment of error, the defendant contends that the trial court erred in allowing the State's challenges for cause of prospective jurors on the basis of their opposition to capital punishment without first giving the defendant an opportunity to attempt to rehabilitate them. During jury selection, the State challenged ten

prospective jurors for cause on the basis of their opposition to the death penalty. The defendant moved to be allowed to attempt to rehabilitate each of those jurors. The trial court denied all such requests. Thereafter, the defendant presented the trial court with a list of seventeen "rehabilitation" questions he wished to ask those prospective jurors before they were excused for cause. That list of "rehabilitation questions" was not made a part of the Record on Appeal and cannot be considered by this Court in passing upon the defendant's present argument that the trial court erred by refusing to allow him to attempt to rehabilitate prospective jurors. Nevertheless, we are able to resolve this issue in the present case without examining the seventeen questions proposed by the defendant.

A juror is properly excused for cause in a capital case if his or her views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). As we have recently stated:

> Where a person's responses reveal that he does not believe in the death penalty and that his belief would interfere with the performance of his duty at the guilt-innocence or sentencing phase, these responses demonstrate that he cannot fulfill the obligations of a juror's oath to follow the law in carrying out his duties as a juror; and the trial court does not err in excusing him for cause.

*State v. Gibbs*, 335 N.C. 1, 29, 436 S.E.2d 321, 337 (1993), *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (1994).

In the present case, each of the ten prospective jurors who are the subject of this assignment of error indicated that he or she did not believe in the death penalty and could not imagine circumstances under which he or she would vote to recommend a sentence of death. Prospective juror Boone stated that he did not believe in the death penalty. He further stated that he knew of no circumstances under which he would vote for the death penalty and that he would automatically vote against that penalty.

Prospective juror Vick stated that she had never believed in the death penalty and could foresee no set of facts under which she would vote for death. She further stated that she would automatically vote against recommending the death penalty.

Prospective juror Atkinson stated that she had never believed in the death penalty. She stated that regardless of the facts in a particu-

lar case, she would vote to recommend life imprisonment rather than death.

Prospective juror Murray stated that although he believed in the death penalty, he would not vote for it since he could not make that decision. He stated that he would vote for life imprisonment under all circumstances.

Prospective juror Finch stated that she had never believed in the death penalty and could think of no facts under which she would vote for that penalty. She said that she would automatically vote for a life sentence rather than for the death penalty.

Prospective juror Artis first said that he could consider both life and death and that, although he did not believe in the death penalty, he would not automatically vote against death. Thereafter, the bifurcated nature of a capital trial was explained to prospective juror Artis. The prosecutor then asked him again whether he could vote for the death penalty. Juror Artis replied that he would not. He indicated that he would vote for life imprisonment rather than death, regardless of the facts.

Prospective juror Blackmon stated that she did not believe in the death penalty and could not foresee any case in which she would vote for its application. She said that she did not know whether she would automatically vote against the death penalty. After the nature of a capital sentencing proceeding was explained to her, prospective juror Blackmon said that she did not think she could sit on a capital jury. Thereafter, she stated that she would automatically vote against a sentence of death and for life imprisonment.

Prospective juror Ashley stated that she did not believe in the death penalty and could not foresee any facts or circumstances under which she would vote for its imposition. She said that in every case she would always vote for life.

Prospective juror Peterson stated that for religious reasons she did not believe in the death penalty and could not foresee any case in which she would vote for its imposition. She said that she would automatically vote for life in every case.

Finally, prospective juror Harris stated that he did not believe in the death penalty and knew of no facts or circumstances under which he would vote for that penalty. He stated that he would automatically vote for life imprisonment in every case.

STATE v. KEEL

[337 N.C. 469 (1994)]

The foregoing statements by the ten prospective jurors in question here clearly were sufficient to require their excusal for cause. *Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52; *Gibbs*, 335 N.C. at 29, 436 S.E.2d at 37. Further, we have held that when a challenge for cause is supported by a prospective juror's answers to questions propounded by the prosecutor and by the trial court, the trial court does not abuse its discretion, at least absent a showing that further questioning would likely have produced different answers, by refusing to allow the defendant to question the challenged prospective juror about the same matter. *State v. Brogden*, 334 N.C. 39, 44, 430 S.E.2d 905, 908 (1993).

> The defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. The reasoning behind this rule is clear. It prevents harassment of prospective jurors based on their personal views toward the death penalty.

*State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990).

In the present case, each of the prospective jurors excused for cause due to their views on the death penalty unequivocally stated that he or she was opposed to the death penalty and could not vote for its imposition. The defendant has shown nothing tending to indicate that further questioning was likely to have produced any different answers. Therefore, the trial court did not err in denying the defendant's request to attempt to rehabilitate these prospective jurors by further questioning. This assignment of error is without merit.

[2] By another assignment of error, the defendant contends that the trial court erred when it failed to instruct the jury properly on the "sixth element" of first-degree murder. During the trial court's instructions, it instructed that for the jury "to find the defendant guilty of first-degree murder, the State must prove six things beyond a reasonable doubt." The trial court then instructed the jury *inter alia* that it could convict only if it found that the defendant (1) "intentionally and with malice killed the victim with a deadly weapon," (2) "that the defendant's act was a proximate cause of the victim's death," (3) "that the defendant intended to kill the victim," (4) "that the defendant acted with premeditation," and (5) "that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind." The trial court also instructed: "And sixth, that the defendant did not act in self-defense or that the defendant was the aggressor

in bringing on the fight with the intent to kill or inflict serious bodily harm upon the deceased." After receiving these and other instructions, the jury retired to deliberate.

After deliberating for approximately one hour, the jury returned to the courtroom and requested that the trial court "restate the six requirements necessary to prove first-degree murder." The trial court reinstructed the jury according to its original instruction in this regard, but omitted the sixth instruction quoted above. The defendant made no objection.

The trial court then asked, "does that answer the request of the jury?" The jury indicated that it did. The trial court then allowed the jury to continue its deliberations. Thereafter, the jury returned with a unanimous verdict finding the defendant guilty of murder in the first degree.

After the lunch break, with all parties present and out of the presence of the jury, the trial court made the following findings:

Let the record show that during jury deliberations, the jury advised the court that they [sic] would like the six requirements necessary to prove first-degree murder.

Pursuant to that request, the court instructed the jury on the first five requirements set out in the Criminal Pattern Jury Instruction 206.10; that the court thereupon asked counsel for the State and the defendant if there was anything further; that Mr. Thomas Sallenger, one of the attorneys for the defendant, approached the bench with Assistant District Attorney Graham and asked the court to instruct on voluntary intoxication.

The court thereupon instructed the jury on voluntary intoxication. The court then inquired of counsel for the defendant if there was anything further and Mr. Sallenger indicated that there was nothing further for the defendant.

The court inquired of the jury if the court had answered its question and the jury indicated that it had; that thereafter the jury returned with its verdict of first-degree murder. The court had the jury returned to its room and the court went into chambers for a brief discussion with the attorneys as to how the court planned to proceed during the next phase.

That while in chambers, the Judge inquired of counsel for the defendant if the court had made any error in the trial and counsel

informed the court [that] the court had not instructed the jury on the sixth requirement and that he had not wanted the court to so instruct.

The trial court then asked counsel for the defendant and for the State whether they wished to add to or object to those findings, and they indicated that they did not.

The following dialogue then occurred between counsel for the defendant and the trial court.

MR. SALLENGER: Your Honor, out of the presence of the jury and after having heard read into the record the statement by the court, *which is in all respects accurate,* on behalf of the defendant we move for a mistrial and we would also move for . . . the court to set aside the verdict of the jury in this case. Thank you, sir.

THE COURT: I will withhold ruling on your motion at this time.

(Emphasis added). The trial court ultimately denied both of these motions.

The defendant now argues that the trial court's reinstructions on first-degree murder had "the effect of directing a verdict for the State on the sixth essential element of first-degree murder [absence of self-defense]," and that this "impermissibly lessened the State's burden of proving each and every essential element of the crime charged beyond a reasonable doubt." He contends that this was error entitling him to a new trial.

Where, as here, the defendant fails to object to the trial court's instructions at trial, our review is limited to a review for "plain error." *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Before we will conclude that an error by the trial court amounts to "plain error," we must be convinced that absent the error the jury probably would have reached a different verdict. *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986). In other words, we must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. *Id.* "Therefore, the test for 'plain error' places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection." *Id.* Bearing these principles in mind, we must determine

whether the trial court committed plain error in the instructions the defendant challenges here.

The defendant argues that the trial court's failure to reinstruct that the jury must find that the defendant did not act in self-defense before finding him guilty was a failure to instruct on an "essential element" of murder in the first degree. We do not agree.

First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Huffstetler*, 312 N.C. 92, 109, 322 S.E.2d 110, 121 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). The absence of self-defense is not an "element," essential or otherwise, of murder. *Id.*; N.C.G.S. § 14-17 (1993). Nevertheless, a reasonable argument can be made that, upon the particular evidence presented in the present case, the trial court correctly instructed the jury during its initial instructions that to convict the defendant of murder in the first degree the jury must find that he did not act in self-defense; this is so because the defendant's self-serving statements that the victim was attacking the defendant with a knife the first time—but not the second time—the defendant shot him were introduced as evidence at trial. For purposes of this appeal, we assume *arguendo* that the trial court properly instructed the jury in this regard during its initial instructions.

Having assumed *arguendo* that the evidence in the present case raised an issue of self-defense and required an initial instruction on that defense, we nevertheless conclude that the failure of the trial court to reinstruct on this matter in response to the jury's inquiry was not plain error. After deliberating for approximately one hour, the jury returned to the courtroom and indicated that it wished to have the trial court "restate the six requirements necessary to prove first-degree murder." The trial court then reinstructed the jury on the elements of first-degree murder, but omitted any reference to self-defense. Thereafter, the jurors indicated that the trial court's response answered their question and was a sufficient response. They did so despite the fact that their question clearly indicated that they were aware that the initial instruction had included a sixth "requirement" for conviction in the present case. This leads to the conclusion that the jury was concerned with some matter involving one of the elements of the crime of first-degree murder and not with any issue of self-defense—which is a justification for killing, the absence of which is not an element of murder. Therefore, it is unlikely that the

trial court's failure to reinstruct on the issue of absence of self-defense had any effect on the jury.

Additionally, the defendant's own statements at trial indicated that when the victim was advancing upon him with a knife, the defendant shot the victim who then fell to the floor. The defendant put the victim in the truck and moved the truck to a place beside the window of the farm office. The defendant went back into the building with a rifle and went into the office. He fired a shot through the window into the victim's head while the victim was sitting slumped over in the truck. When taken in light of the defendant's threat the night before the killing and physical evidence at the scene of the crime, we believe that the defendant's own evidence indicates that the trial court's failure to reinstruct the jury concerning absence of self-defense had no effect on the jury. Certainly, we cannot say that absent the alleged error the jury probably would have reached a different verdict or that the alleged error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. Therefore, we conclude that any error by the trial court in this regard did not amount to plain error. *Walker*, 316 N.C. at 39, 340 S.E.2d at 83. This assignment of error is without merit.

[3] By another assignment of error, the defendant contends that the trial court erred in failing to dismiss the first-degree murder charge against him. In support of this assignment he argues that the evidence was insufficient as a matter of law to permit a rational finding of the elements of the charged offense.

When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Whether evidence presented constitutes substantial evidence is a question of law for the court. *Id.* at 66, 296 S.E.2d at 652. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). The trial court's function is to determine whether the evidence will permit a *reasonable inference* that the defendant is guilty of the crimes charged. *Earnhardt*, 307 N.C. at 67, 296

S.E.2d at 652. "In so doing the trial court should only be concerned that the evidence is sufficient to get the case to the jury; it should not be concerned with the weight of the evidence." *Id.* It is *not* the rule in this jurisdiction that the trial court is required to determine that the evidence excludes every reasonable hypothesis of innocence before denying a defendant's motion to dismiss. *Powell*, 299 N.C. at 101, 261 S.E.2d at 118; *State v. Stephens*, 244 N.C. 380, 383-84, 93 S.E.2d 431, 433 (1956).

*State v. Vause*, 328 N.C. 231, 236-37, 400 S.E.2d 57, 61 (1991).

It is by now familiar learning that:

"The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion."

*Id.* at 237, 400 S.E.2d at 61 (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)). The issue before us here is whether, applying the foregoing rules, a reasonable inference of the defendant's guilt can be drawn from the evidence presented at trial.

In applying the foregoing rules to a motion to dismiss a prosecution for murder in the first degree, it must be determined whether the evidence, viewed in the light most favorable to the State, is sufficient to permit a jury to make reasonable inferences and findings that the defendant, after premeditation and deliberation, formed and executed a fixed purpose to kill. *State v. Walters*, 275 N.C. 615, 623, 170 S.E.2d 484, 490 (1969).

"First-degree murder is the unlawful killing of a human being with malice, premeditation and deliberation." *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E.2d 791, 795 (1981). Premeditation and deliberation generally must be established by circumstantial evidence, because they ordinarily " 'are not susceptible to proof by direct evidence.' " *Id.* (quoting *State v. Love*, 296 N.C. 194, 203, 250 S.E.2d 220, 226-27 (1978)). "Premeditation" means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing. *Id.* "Deliberation" means that the intent to kill was formed while the defendant was in a cool state of blood and not under the influ-

ence of a violent passion suddenly aroused by sufficient provocation. *Id.* In the context of determining the existence of deliberation, however, the term "cool state of blood" does not mean " 'an absence of passion and emotion.' " *Id.* (quoting *State v. Faust*, 254 N.C. 101, 108, 118 S.E.2d 769, 773, *cert. denied*, [368] U.S. 851, 7 L. Ed. 2d 49 (1961). One may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. *Id.*

*Vause*, 328 N.C. at 238, 400 S.E.2d at 62.

Premeditation and deliberation are mental processes. Generally, they are not subject to proof by direct evidence but must be proved, if at all, by circumstantial evidence. Among other circumstances from which premeditation and deliberation may be inferred are "(1) lack of provocation on the part of the deceased, (2) the conduct and statements of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill-will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds." *State v. Gladden*, 315 N.C. 398, 430-31, 340 S.E.2d 673, 693, *cert. denied*, 479 U.S. 870, 93 L. Ed. 2d 166 (1986).

In the present case, the State presented substantial evidence to support the jury in finding that on the day before the killing, the defendant threatened the victim by declaring that he would kill the victim. Further, there was evidence of ill-will between the parties as a result of arguments between the defendant and the victim's wife and due to the fact that the victim felt that the defendant had been "messing" with the victim's wife. The defendant's own testimony at trial was that he dealt a lethal wound to the deceased after the deceased had been felled and rendered helpless. The defendant testified that after initially shooting and felling the victim in the farm office, he placed the victim in the victim's truck and parked it immediately outside the office. He then shot through the window of the truck rendering a second lethal wound to the victim. Overall, the evidence presented at trial would support inferences and findings to the effect that the defendant plotted to kill his father-in-law. He then lured the victim to the farm on a pretext, where he shot him twice causing his death. Thereafter, the defendant made every effort possible to conceal his

crime by giving various contrived versions of what had occurred and by concealing or destroying physical evidence that the crime had been committed. The evidence in the present case clearly was substantial evidence tending to show that the defendant unlawfully killed his victim with malice and after premeditation and deliberation. The trial court did not err in denying the defendant's motions to dismiss the charge against him. This assignment of error is without merit.

[4] By another assignment of error, the defendant contends that the trial court erred during his capital sentencing proceeding by allowing the jury to consider his previous conviction for involuntary manslaughter as the basis for finding an aggravating circumstance. The sole aggravating circumstance submitted to and found by the jury was that the defendant "had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3) (1988). The evidence introduced by the State during the capital sentencing proceeding to support this aggravating circumstance was in the form of a certified copy of a judgment entered upon the defendant's 20 March 1987 conviction for the involuntary manslaughter of his infant son, Victor Keel. The State also introduced evidence tending to show that the child had suffered many injuries shortly prior to his death. These included a three-inch fracture to the base of the skull which caused the brain to swell by approximately twenty-five percent. Expert testimony tended to show that it would have taken a considerable amount of force to inflict the child's skull fracture, and it could have been caused by the infliction of blows to the child's head. Further, evidence tended to show that at the time of the child's death, he had suffered very recent bruises and abrasions to the forehead, the back of the head, the back, the arms, the bridge of the nose, the ears and the back of the legs, all of which were consistent with being struck substantial blows.

The defendant first contends that the trial court erred in submitting the aggravating circumstance because his conviction for involuntary manslaughter could not be considered a felony "involving the use of violence to the person" within the meaning of N.C.G.S. § 15A-2000(e)(3). He reasons that this is so because involuntary manslaughter is by definition an *unintentional* killing. He contends that the intent of the General Assembly in recognizing as an aggravating circumstance that a defendant had "been previously convicted of a felony involving the use of violence to the person" was to make only intentional crimes of violence aggravating circumstances. We do not agree.

For purposes of N.C.G.S. § 15A-2000(e)(3), the prior felony conviction can be either a conviction for a felony which has as an element the use or threat of violence to the person, such as rape or armed robbery, or a conviction for a felony which does not have the use or threat of violence to the person as an element, but is committed with the use or threat of violence to the person. *State v. McDougall*, 308 N.C. 1, 18, 301 S.E.2d 308, 319, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). Further, it is not required that the defendant's prior felony conviction involve the "intentional" use or threat of violence to another person. Nothing in the wording of the statute hints at a legislative intent that the prior felony conviction must have involved such an intentional use or a threat of violence to another person. We conclude that the prior felony conviction may properly be used in the present case as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(3). *Cf. State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978) (while involuntary manslaughter imports an unintentional killing, that is the absence of a specific intent to kill, it is nevertheless accomplished by means of an intentional act). The trial court did not err by submitting this aggravating circumstance for the jury's consideration in the present case.

[5] The defendant also argues that the trial court erred in declining to give the defendant's proposed instruction with regard to this aggravating circumstance. The defendant expressly requested that the trial court instruct the jury: "Members of the jury, I instruct you that violence is the use of extreme force with the intent to inflict harm or destruction." For the reasons we have just discussed, this proposed instruction is an erroneous statement of law. Therefore, the trial court did not err in refusing to give the requested instruction to the jury.

[6] By another assignment of error the defendant contends that the definition of the aggravating circumstance created by N.C.G.S. § 15A-2000(e)(3) is vague and overbroad and, for that reason, violates the Constitution of the United States and the Constitution of North Carolina. We have previously decided this issue contrary to the defendant's position and he has presented no convincing reason for us to deviate from our prior holding on this issue. *State v. Brown*, 320 N.C. 179, 213-14, 358 S.E.2d 1, 23-24, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). This assignment of error is without merit.

[7] By another assignment of error, the defendant contends that the trial court erred in failing to give his requested instruction defining

**STATE v. KEEL**

[337 N.C. 469 (1994)]

mitigating circumstances and directing the jurors that they could properly base their sentencing recommendation upon any sympathy they might have for the defendant. The requested instruction stated that mitigating circumstances are not limited to circumstances that extenuate the gravity of the offense but also extend to any aspect of the defendant's background or character a juror deems a reason supporting a sentence less than death. The requested instruction also stated, "you are entitled to base your verdict upon any sympathy or mercy you may have for the defendant that arises from the evidence presented in this case."

The trial court declined to give the requested instruction and, instead, instructed the jury that:

> A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a lesser degree of crime than first-degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first-degree murders.

The defendant, citing *California v. Brown*, 479 U.S. 538, 93 L. Ed. 2d 934 (1987), contends that the trial court erred in refusing his requested instruction because this ruling unconstitutionally prevented the jury from considering as mitigating any sympathy it had for the defendant that arose from the evidence presented in this case. We do not agree.

In *Brown*, the Supreme Court of the United States held that it was constitutionally permissible for a trial court to admonish the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Brown*, 479 U.S. at 542, 93 L. Ed. 2d at 940. The Supreme Court reasoned in *Brown* that the use of the word "mere" in the trial court's instruction had indicated to the jury that it was to avoid responding to emotional appeals divorced from an evidentiary basis. The Supreme Court concluded in *Brown* that a defendant's Eighth Amendment rights are jeopardized only when the jury is urged to ignore such feelings *that arise from evidence introduced during the defendant's trial.* The trial court's instructions in the present case had no such effect.

After defining the term "mitigating circumstance" as quoted above, the trial court instructed the jury:

> Our law identifies several possible mitigating circumstances. However, in considering Issue Two, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character or record and any of the circumstances of this murder that the defendant contends [form] a basis for a sentence less than death and any other circumstance arising from the evidence which you deem to have mitigating value.

We conclude that, taken in context, this instruction clearly informed the jurors that they could consider any circumstance—including sympathy for the defendant—they found to arise from the evidence and deemed to have mitigating value. Therefore, we deem the trial court's instructions in the present case to be consistent with the teaching of *Brown* and not in violation of the Eighth Amendment. *Cf. State v. Price*, 326 N.C. 56, 86-88, 388 S.E.2d 84, 101-02 (prosecutor's argument deemed to amount to an argument that feelings of sympathy arising in the jurors' hearts but not also supported by evidence could not be permitted to affect their verdict), *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds*, —— U.S. ——, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, —— U.S. ——, —— L. Ed. 2d —— (1994). This assignment of error is without merit.

[8] By another assignment of error, the defendant contends that the trial court's use of the Issues and Recommendation sheet in the present case violated the prohibition against cruel and unusual punishment contained in the Eighth Amendment and denied him due process in violation of the Fifth Amendment. Issue Three on the Issues and Recommendation sheet which was given to the jury during the capital sentencing proceeding in this case required that the jury answer the following question: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance found?" The defendant argues that this language is defective because it allows a jury to recommend death if it finds that the mitigating circumstances are of equal weight and value to the aggravating circumstances found. We have previously rejected precisely the same argument. In doing so, we stated:

> The defendant says [Issue Three] is deficient because if the jury is in equipoise it must answer the issue "yes" and impose the death penalty. We do not believe that the defendant['s] . . . analy-

sis of the issue is correct. If the jury must be satisfied beyond a reasonable doubt before finding the mitigating circumstances are insufficient to outweigh the aggravating circumstances and the jury is in a state of equipoise as to the issue it would answer the issue "no." We hold [that Issue Three] was properly submitted.

*State v. Hunt,* 323 N.C. 407, 433, 373 S.E.2d 400, 416-17 (1988), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand,* 330 N.C. 501, 411 S.E.2d 806, *cert. denied,* —— U.S. ——, 120 L. Ed. 2d 913 (1992). For the same reason, we hold that this assignment of error is without merit.

**[9]**  By another assignment of error, the defendant contends that the trial court deprived him of his right to be free from cruel and unusual punishment, as guaranteed by the Constitution of the United States and the Constitution of North Carolina, when the trial court instructed the jury that the defendant had the burden of proving mitigating circumstances by a preponderance of the evidence. We have consistently held that this instruction is constitutionally permissible. *E.g., State v. Huff,* 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated on other grounds,* 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand,* 328 N.C. 532, 402 S.E.2d 577 (1991). This assignment of error is without merit.

**[10]**  By another assignment of error, the defendant contends the trial court erred by instructing the jurors that they were not to consider any mitigating circumstances unless they deemed those mitigating circumstances to have mitigating value. We do not agree.

The issues submitted to the jury during the capital sentencing proceeding in the present case were set forth in writing on the Issues and Recommendation as to Punishment Form. They were:

Issue One: Do you unanimously find from the evidence beyond a reasonable doubt the existence of the following aggravating circumstance?

. . . .

Issue Two: Do you find from the evidence the existence of one or more of the following mitigating circumstances?

. . . .

Issue Three: Do you unanimously find beyond a reasonable doubt that the mitigating circumstances found is, or are, insufficient to outweigh the aggravating circumstance found?

. . . .

Issue Four: Do you unanimously find beyond a reasonable doubt that the aggravating circumstance you found is sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?

The defendant now argues that the issues contained on the form, when taken with the trial court's instructions regarding nonstatutory mitigating circumstances, deprived him of his constitutional rights. He contends that this is so because the decision of the Supreme Court of the United States in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), mandates that constitutional consideration of mitigating evidence in North Carolina take place at Issues Three and Four, but the trial court's instructions limited consideration of mitigating evidence to Issue Two. The defendant further argues that the question of whether a mitigating circumstance, if proved, has mitigating value is a question of law and may not be left to the individual jurors.

This Court has consistently held that when a jury determines that a *statutory* mitigating circumstance exists, it is not free to refuse to consider the circumstance and must give it some weight in its final sentencing determinations, but the amount of weight any circumstance may be given is a matter left to the jury. *Huff*, 325 N.C. 1, 381 S.E.2d 635. We have also consistently held, however, that it is for the jury to determine whether submitted *nonstatutory* mitigating circumstances established by the evidence should be given any mitigating value. *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765, *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied,* —— U.S. ——, 123 L. Ed. 2d 503 (1993); *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). As a matter of law, *nonstatutory* mitigating circumstances are mitigating only when one or more jurors deem them to be so. N.C.G.S. § 15A-2000(f)(9) (1988). We conclude that this procedure is not unconstitutional. As the Supreme Court of the United States has recently stated:

"*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by

limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all."

*Johnson v. Texas,* —— U.S. ——, ——, 125 L. Ed. 2d 290, 302, *reh'g denied,* —— U.S. ——, 125 L. Ed. 2d 767 (1993) (quoting *McKoy,* 494 U.S. at 456, 108 L. Ed. 2d at 389 (Kennedy, J., concurring in judgment)).

Under the North Carolina capital sentencing scheme, the only limit on the use of any proffered *nonstatutory* mitigating circumstance is that one or more jurors must determine that it exists and that it in fact has mitigating value. In the present case, the jury instructions given were strictly in accord with the North Carolina Pattern Jury Instructions as amended to conform to the dictates of the Supreme Court of the United States in its opinion in *McKoy.* The instructions given expressly state that any single juror may find that a nonstatutory mitigating circumstance exists and may deem it to have mitigating value. If one juror does so, the foreman writes "yes" after Issue Two and writes "yes" again after the proffered non-statutory mitigating circumstance as listed on the form. After considering each nonstatutory mitigating circumstance submitted, the jury then proceeds to Issue Three, where each juror is required to weigh all such mitigating circumstances he or she has found to exist and to have mitigating value against the aggravating circumstance or circumstances found by the jury to exist. Here the jury was properly instructed *inter alia* that when deciding Issue Three, "each juror may consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in Issue Two."

With regard to Issue Four, the jury was further instructed *inter alia* that in making its comparison when deciding the sentence to recommend, "each juror may consider any mitigating circumstance or circumstances that any juror determined to exist by a preponderance of the evidence." We conclude that the Issues and Recommendation as to Punishment Form used by the trial court, together with the trial court's instructions in their entirety during the capital sentencing proceeding, emphasized properly that each juror was to consider and give weight to all evidence that juror found to be mitigating. Therefore, we conclude that consideration of mitigating evidence was not foreclosed by the failure of one or more jurors to find one or more of the proffered mitigating circumstances included in writing

under Issue Two on the form. *See McKoy*, 494 U.S. at 443, 108 L. Ed. 2d at 381.

The Issues and Recommendation as to Punishment Form reveals that the jury found six of the nonstatutory mitigating circumstances proffered as well as the "catch-all" mitigating circumstance of "[a]ny other circumstance or circumstances arising from the evidence which one or more of you deems to have mitigating value." We are convinced that each juror was permitted to, and in fact did, consider all of the mitigating evidence he or she found to exist and that the instructions given by the trial court here were without error. *Johnson*, —— U.S. at ——, 125 L. Ed. 2d at 302. This assignment of error is without merit.

**[11]** By another assignment of error, the defendant contends that the North Carolina death penalty statute, N.C.G.S. § 15A-2000, is facially unconstitutional because jury discretion is not guided appropriately by objective standards. Additionally, he argues that the statute is unconstitutional as applied because the absence of objective standards has caused it to be applied in an arbitrary and capricious manner. As the defendant concedes, this question has been decided contrary to his position on numerous occasions. *E.g., State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990) (holding that *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), did not invalidate North Carolina's statutory capital sentencing scheme). The defendant has presented no new argument on this issue. We conclude that the statute does not violate the Constitution of the United States or the Constitution of North Carolina. This assignment of error is without merit.

**[12]** Having concluded that the defendant's trial and separate capital sentencing proceeding were free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have thoroughly examined the record, transcripts and briefs in the present case and conclude that the record fully supports the aggravating circumstance found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime

and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 354, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

> In comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E.2d at 355. "The pool, however, includes only those cases which this Court has found to be free of error in both phases of the trial." *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987). It is important to note, as we have recently pointed out, that the composition of this "proportionality pool" of cases reflects post-conviction relief awarded to death-sentenced defendants. *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994).

> Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.

*Id.* at ——, 446 S.E.2d at ——. Further, we have pointed out that:

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for

example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

In the present case, the defendant was convicted of murder in the first degree upon the theory that the murder was committed after premeditation and deliberation. The jury found a single aggravating circumstance—that the defendant had been previously convicted of a felony involving the use or threat of violence to the person. N.C.G.S. § 15A-2000(e)(3) (1988). The jury found as mitigating circumstances: (1) that the murder was committed while the defendant was under the influence of mental or emotional disturbance, (2) that the defendant was physically or psychologically dependent on alcohol or physically or psychologically dependent on drugs, (3) that the defendant was gainfully employed and had a good work record at the time of the offense, (4) that the defendant had a good prison record while previously in prison, (5) that the defendant organized a prison choir, was president of Community Outreach Assistance, and helped raise funds used to improve his prison unit while in prison, (6) that the defendant satisfactorily completed Bible courses at Heritage Bible College while in prison, (7) that the defendant obtained a high school equivalency diploma while in prison, and (8) the catch-all mitigating circumstance of "[a]ny other circumstance or circumstances arising from the evidence which one or more of you deems to have mitigating value."

In our proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (1994). This case is not particularly similar to any of the cases in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. Each of those cases may be distinguished from the present case.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the evidence tended to show that the defendant hid in the bushes at a bank and waited for the victim to make a night deposit. When the victim arrived, the defendant demanded the money bag. The victim hesitated, and the defendant fired a shotgun striking him in both legs. The victim later died of cardiac arrest caused by the loss of blood from the shotgun wounds. The jury found only the aggravating circum-

stance of murder for pecuniary gain. *Benson* is not similar to the present case. Here, the evidence tended to indicate that the defendant planned the murder in advance, lured his victim to the murder scene by virtue of a ruse, shot the defendant from a concealed position and attempted to conceal his crime by making it appear that the victim had been killed as a result of a random drive-by shooting.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant and several others planned to rob the victim's place of business. During the robbery, one of the assailants beat the victim, killing him. *Stokes* is also distinguishable from the present case. In *Stokes* there was evidence which tended to show that the actual killing of the victim occurred on the spur of the moment and was not carefully planned. Further, some of the evidence, if believed, tended to show that Stokes himself was minimally involved in the actual killing of the robbery victim. In the present case, overwhelming evidence tended to show that the defendant planned the murder well in advance, executed it carefully, and then carried out a plan to conceal the fact that he had done the killing.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the aggravating circumstance found by the jury was that the murder for which the defendant was convicted was part of a course of conduct which included the commission of other crimes of violence against another person or persons. The evidence tended to show that the defendant and two men who were sitting in a car got into an argument outside a bar near midnight. The victim was gesturing with his hands and arguing when the defendant suddenly pulled a pistol and shot him. The evidence in the present case tended to show a calculated murder, carefully planned and executed. Further, the defendant here, unlike the defendant in *Rogers*, had previously been convicted of another homicide.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant and two companions went to the victim's home intending to rob and murder him. After gaining entry into the victim's home, the men killed him and stole his money. The jury found as aggravating circumstances that the murder was committed during the commission of a robbery or burglary and that it was committed for pecuniary gain. In concluding that the death penalty was disproportionate in *Young*, this Court focused on the failure of the jury in *Young* to find either the aggravating circumstance that the murder was especially heinous,

atrocious or cruel or the aggravating circumstance that the murder was committed as part of a course of conduct which included the commission of violence against another person or persons. The present case is distinguishable from *Young.* Here, the defendant had pre-viously been convicted of another homicide, unlike the defendant in *Young.*

In *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984), the aggravating circumstance found by the jury was that the murder was committed against a law enforcement officer engaged in the performance of his official duties. In *Hill,* unlike the present case, all of the evidence tended to show that the defendant did not plan the killing in advance. The killing was a sudden, but inexcusable, response to being seized by the officer. In the present case, evidence tended to indicate that the defendant carefully planned and executed the murder and its concealment. Further, the defendant in the present case, unlike the defendant in *Hill,* had previously been convicted of another homicide.

In *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant was on foot and waived down the victim as the victim passed in his truck. Shortly thereafter, the victim's body was discovered in the truck. He had been shot twice in the head and his wallet was gone. The aggravating circumstance found was that the murder was committed for pecuniary gain. No evidence in *Jackson* tended to show the precise circumstances under which the killing occurred. Here, however, the evidence was to the effect that the defendant carefully planned and executed the killing and then attempted to conceal his participation. Additionally, the defendant in the present case, unlike the defendant in *Jackson,* had been convicted of a prior homicide.

In *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983), the evidence tended to show that the defendant and a group of friends were riding in a car when the defendant taunted the victim by telling him that he would shoot him and by questioning whether the victim believed that the defendant would shoot him. The defendant shot the victim, but then immediately directed the driver to proceed to the emergency room of the local hospital. In concluding that the death penalty was disproportionate there, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. In contrast, the evidence in the present case tended to show that the defendant carefully posi-

tioned himself to shoot his victim a second time in order to ensure his death. Additionally, the defendant in the present case had previously been convicted of another homicide.

For the foregoing reasons, we conclude that each of the cases in which we have found the death penalty to be disproportionate is distinguishable from the present case. In fact, the present case is not particularly similar to any of those cases.

In performing our statutory duty of proportionality review, it is also appropriate for us to compare the case before us to other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503.

> If, after making such comparisons, we find that juries have consistently returned death sentences in factually similar cases, we will have a strong basis for concluding that the death sentence under review is not excessive or disproportionate. If juries have consistently returned life sentences in factually similar cases, however, we will have a strong basis for concluding that the death sentence in the case under review is disproportionate.

*McCollum*, 334 N.C. at 242, 433 S.E.2d at 163. However, the matters to be considered and their relevance during proportionality review in a given capital case "will be as numerous and as varied as the cases coming before us on appeal." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. For that reason, the fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review.

Early in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." *Id.* at 80-81, 301 S.E.2d at 356. To the contrary, we plainly stated that the constitutional requirement of "individualized consideration" as to proportionality could only be served if the issue of whether the death penalty was disproportionate in a particular case ultimately rested upon the "experienced judgments" of the members of this Court, rather than upon mere numerical comparisons of aggravators, mitigators and other circumstances. Additionally, "the fact that one, two, or several juries have returned recommendations of life

imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47 (1994).

The defendant in the present case refers us to several cases in which juries during capital sentencing proceedings recommended life sentences. Most of those cases are factually dissimilar from the present case and involved situations in which the juries found aggravating circumstances other than the one found in the present case. One of those cases is, however, somewhat similar to the present case.

In *State v. Withers*, 311 N.C. 699, 319 S.E.2d 211 (1984), a Mecklenburg County jury recommended a life sentence upon a first-degree murder conviction, although the defendant had been convicted of a prior violent felony. In *Withers*, the defendant shot an eleven-year-old child twice in the back causing her death and also wounded the child's mother. The State presented evidence that the defendant had been paroled after serving thirteen years of a life sentence imposed upon a previous conviction for murder in the first degree. The jury returned verdicts finding the defendant guilty of murder in the first degree and of assault with a deadly weapon with intent to kill.

A capital sentencing proceeding was then conducted before the same jury. The jury found two aggravating circumstances: (1) that the defendant had been previously convicted of a felony involving the use or threat of violence to the person, and (2) that this murder was part of a course of conduct in which the defendant engaged and which included the commission by him of other crimes of violence against a person or persons. The jury also found one or more of the ten mitigating circumstances submitted without specifying which ones it had found. The jury found that the aggravating circumstances were insufficient to outweigh the mitigating circumstances and recommended a sentence of life imprisonment. As required by law, the trial court followed the jury's recommendation and entered a sentence of life imprisonment.

We acknowledge that *Withers* is rather similar to the present case when considered for purposes of proportionality review. However, we conclude that *Withers* stands in stark contrast to the ordinary run of capital cases. Using just two cases as examples of this point, we note that juries recommended death in both *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), and *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*,

484 U.S. 970, 98 L. Ed. 2d 406 (1987). In both of those cases, the jury found the prior violent felony aggravating circumstance. In any event, we reiterate here that "the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. Certainly, *Withers* is an aberration and does not represent a consistent trend of life sentences sufficient to provide us with any strong basis for concluding that the death sentence in the present case is disproportionate.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all of the cases in the pool when engaging in our statutorily mandated duty of proportionality review, we reemphasize "that we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* "The Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977." *Williams*, 308 N.C. at 81-82, 301 S.E.2d at 356. Here, it suffices to say that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found that sentence disproportionate or those in which juries have *consistently* returned recommendations of life imprisonment. *E.g.*, *McDougall*, 308 N.C. 1, 301 S.E.2d 308 (murder where jury found as an aggravating circumstance that the defendant had previously been convicted of a felony involving the use of violence to the person). After comparing this case carefully with all others in the pool used for proportionality review, we conclude that it falls within the class of first-degree murders in which we have previously upheld the death penalty. For the foregoing reasons, we conclude that the sentence of death entered in the present case is not disproportionate.

Having considered and rejected all of the defendant's assigned errors, we hold that the defendant's trial and capital sentencing proceeding were free of prejudicial error and that the resulting sentence of death was not disproportionate punishment. Therefore, the sentence of death entered against the defendant must be and is left undisturbed.

No error.