STATE OF NORTH CAROLINA v. RANDY LEE SELLERS

No. COA01-1284

(Filed 31 December 2002)

**1. Criminal Law—insanity—directed verdict precluded**

The trial court did not err in an assault with a firearm on a law enforcement officer, assault with a deadly weapon inflicting serious bodily injury, and discharging a firearm into occupied

property case by failing to grant defendant's motions to dismiss the charges based upon insanity as a matter of law even though four expert witnesses testified defendant did not know right from wrong at the time of the shooting, because evidence of insanity offered by defendant, even if uncontroverted, is for the jury to determine and precludes the entry of a directed verdict for defendant on insanity.

**2. Sentencing—aggravating factors—knowingly creating great risk of death to more than one person**

The trial court did not err in an assault with a firearm on a law enforcement officer, assault with a deadly weapon inflicting serious bodily injury, and discharging a firearm into occupied property case by finding the aggravating factor under N.C.G.S. § 15A-1340.16(d)(8) that defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person, because: (1) additional evidence was required from the State to prove the existence of N.C.G.S. § 15A-1340.16(d)(8) beyond that required for the offenses themselves; and (2) where, as here, the jury has found defendant's evidence regarding insanity lacking, there is sufficient evidence for a reasonable judge to find that, despite the expert testimony to the contrary, defendant acted knowingly.

**3. Sentencing—aggravating factors—defendant on pretrial release when committed crimes**

The trial court erred in an assault with a firearm on a law enforcement officer, assault with a deadly weapon inflicting serious bodily injury, and discharging a firearm into occupied property case by finding the aggravating factor under N.C.G.S. § 15A-1340.16(d)(12) that defendant was on pretrial release when he committed these crimes, because proof of arrest and absence of proof that a trial occurred is not sufficient evidence to conclude defendant was on pretrial release.

**4. Sentencing—findings—aggravating factors outweigh mitigating factors—clerical error**

Although defendant contends the trial court erred by failing to make the requisite finding that the aggravating factors outweighed the mitigating factors before sentencing defendant to an aggravated term for assault with a firearm on a law enforcement

officer, the transcript revealed that it was a mere clerical error that the trial court can correct on remand.

**5. Constitutional Law—double jeopardy—assault with a firearm on a law enforcement officer—discharging a firearm into occupied property**

The trial court did not violate double jeopardy by sentencing defendant to consecutive terms for the crimes of assault with a firearm on a law enforcement officer and discharging a firearm into occupied property, because: (1) the fact that each crime requires proof of an element which the other does not demonstrates the intent to allow multiple punishments to be imposed for the separate crimes; and (2) one crime requires proof of a law enforcement officer then performing his duties while the other requires proof of willful and wanton discharging of a firearm into occupied property.

Judge WYNN concurring.

Appeal by defendant from judgment entered 7 March 2001 by Judge Osmond Smith in Alamance County Superior Court. Heard in the Court of Appeals 14 August 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Amy L. Yonowitz, for the State.*

*Daniel H. Monroe, for defendant-appellant.*

CAMPBELL, Judge.

Defendant was indicted by the Alamance County Grand Jury for numerous offenses in 1999 and 2000. On 8 November 1999, defendant was indicted for two counts of assault with a deadly weapon on a law enforcement officer, the victims being Officers Sam Ray ("Officer Ray") and Christopher Denny ("Officer Denny") of the Graham Police Department. On 24 January 2000, defendant was indicted for two counts of attempted murder, the victims being Officer Denny and Officer Ray, and assault with a deadly weapon with intent to kill inflicting serious injury upon Officer Denny, and assault with a deadly weapon with intent to kill Officer Ray, and assault with a deadly weapon on a law enforcement officer and assault by pointing a gun, the victim being Officer Peter Acosta ("Officer Acosta") of the Graham Police Department. On 6 November 2000, defendant was indicted for discharging a firearm into occupied property, the occu-

pant being Officer Ray. Defendant was also indicted with superceding indictments for three counts of assault with a deadly weapon on a law enforcement officer, the victims being Officers Ray, Denny and Acosta. On 14 February 2001, the charge of assault by pointing a gun at Officer Acosta was dismissed.

The cases were joined and tried from 19 February 2001 through 7 March 2001 before a jury, Judge Osmond Smith ("Judge Smith"), Alamance County Superior Court, presiding. The jury found defendant not guilty of attempted murder of Officers Denny and Ray. The jury did not base its verdict on defendant's asserted insanity defense. The jury found defendant guilty of the following offenses: assault with a firearm on a law enforcement officer against Officers Denny, Ray, and Acosta; assault with a deadly weapon inflicting serious bodily injury upon Officer Denny; assault with a deadly weapon upon Officer Ray; and discharging a firearm into occupied property.

The court arrested judgment in the case of assault with a deadly weapon upon Officer Ray. The court found as aggravating factors that defendant "knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person," and that defendant "committed the offense while on pretrial release." The court found as mitigating factors that defendant "was suffering from a mental condition that was insufficient to constitute a defense but significantly reduced defendant's culpability for the offense," "has been honorably discharged from the United States Armed Services," "has a support system in the community," and "has a positive employment history or is gainfully employed." The court went on to find that the aggravating factors outweighed the mitigating factors. The court sentenced defendant to four terms, of 31-47 months each, to be served consecutively for the following offenses: assault with a firearm on Officer Ray; discharging a weapon into property occupied by Officer Ray; assault with a firearm and assault with intent to inflict serious bodily injury upon Officer Denny (consolidated for judgment); and assault with a firearm on Officer Acosta. The total sentence imposed was 124-188 months.

The State's evidence tended to show that defendant entered the Pantry Convenience Store in Graham just before 2 a.m. on 28 October 1999 and told the clerk to call the police because he needed to speak to a law man. Defendant was wearing a uniform with an insignia which read "Department of Justice, Federal Bureau of Prisons." He was carrying two guns, a 9 millimeter semi-automatic Ruger pistol,

and a .380 Lorcin semi-automatic pistol. The clerk testified that defendant's eyes were "kind of shiney," "like he had been drinking alcohol." The clerk called 911 and told the operator there was a man with the Department of Justice carrying two guns who wanted to have some Graham police officers come to the store. Officers Acosta and Ray responded in one police car and Officer Denny responded in a separate police car. Officer Ray was driving and pulled up next to defendant. Officer Acosta, speaking through Officer Ray's open window, asked defendant what was up. Defendant responded "Nothing much" and then asked them if they thought that justice had been done in the world that day. When Officer Acosta noticed defendant had a gun (the Ruger), he exited the car, drew his weapon and maneuvered to the rear passenger side. He called to Officer Denny, who was exiting his car, that defendant had a gun and to get him away from the car. Officers Acosta and Denny each told defendant to put down the gun. Defendant said "I'm immortal" and asked if they believed in God. Defendant then shot into the air, maneuvered himself in front of the car and began shooting into the front of the car where Officer Ray was sitting. Officer Acosta fired at defendant, and defendant shot back at Officer Acosta. Officer Ray partially exited the car and shot at defendant. Defendant then moved down the driver's side of the car and fired into the door as Officer Ray dove out of the car. Officer Ray was hit three times in the chest, but was not injured because he was wearing a protective vest. Defendant began walking towards Officer Denny's car attempting to line up a shot. Officer Denny was crouched behind his patrol car when defendant began shooting at him. A bullet struck Officer Denny's hand, rendering him unable to fire his weapon. During a short pause in the exchange of fire, Officer Denny ran towards the back of the Pantry building.

While the bullets were flying between the officers and defendant there were customers inside the store. Some customers were in their cars when the shooting began and had to run into the store for safety. One such individual, Nathaniel Newton, was sleeping in the backseat of a vehicle stopped at the gas pumps and was awakened by the gunshots. He testified, "I sat and I thought. I was like, well, bullets hit the gas pumps and something, they could blow up, and like I could run into the store and be a little safer. . . . I just ducked my head and ran." Another customer, Toby Overman, was preparing to leave the parking lot in his truck when the shooting started. He crouched down in the seat and then exited the truck. He saw defendant with his gun and held up his hands. He first sought cover behind an ATM machine, and then behind the Pantry building.

As defendant headed north on South Main Street, additional officers arrived. Officer Chris Anderson, over a P.A. system, directed defendant to drop his weapon. Defendant continued towards the officers, said "Bring it on" and waved his gun in their direction. The officers shot defendant, who fell and was then handcuffed. The entire incident lasted 3-4 minutes. Officer Acosta recalled defendant had repeatedly yelled that he "was the son of God and wouldn't die."

Defendant's evidence tended to show that defendant had suffered from a mental illness. He was honorably discharged from the Air Force with a 30% mental disability rating. He had been on medication but had stopped taking it before the incident. Four experts testified that in their opinion defendant did not know right from wrong at the time of the incident.

Defendant asserts the trial court erred at trial by: (I) failing to grant defendant's motion to dismiss based upon insanity as a matter of law; (II) finding two aggravating factors; (III) imposing an aggravated sentence without making the necessary findings; and (IV) sentencing defendant to consecutive terms for crimes committed by the same conduct.

## I. Insanity as a Matter of Law

[1] Defendant asserts the trial court erred by denying the motions to dismiss on the grounds that defendant was not guilty by reason of insanity as a matter of law. He directs the court's attention to the four expert witnesses, each of whom testified defendant did not know right from wrong at the time of the shooting. However, "[i]f evidence of insanity is offered by the defendant, even if un-controverted, the credibility of that testimony is for the jury and thus precludes the entry of a directed verdict for defendant on insanity." *State v. Dorsey*, 135 N.C. App. 116, 118, 519 S.E.2d 71, 72 (1999), *cert. denied*, 351 N.C. 363, 542 S.E.2d 221 (2000). Defendant urges the Court to reconsider this holding. We are bound by the precedent, and therefore find that the trial court properly denied defendant's motion to dismiss based upon insanity as a matter of law. *In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 36 (1989).

## II. Sentencing Issues: Finding of Aggravating Factors

[2] Defendant asserts the trial court erred in finding the aggravating factor that "[t]he defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." N.C.

Gen. Stat. § 15A-1340.16(d)(8) (2001). "The State bears the burden of proving by a preponderance of the evidence that an aggravating factor exists." N.C. Gen. Stat. § 15A-1340.16(a). "The trial court's finding of an aggravating factor must be supported by 'sufficient evidence to allow a reasonable judge to find its existence by a preponderance of the evidence.' " *State v. Hughes*, 136 N.C. App. 92, 99, 524 S.E.2d 63, 67 (1999), *disc. rev. denied*, 351 N.C. 644, 543 S.E.2d 878 (2000) (quoting *State v. Hayes*, 102 N.C. App. 777, 781, 404 S.E.2d 12, 15 (1991)). The trial court is permitted great latitude in determining the existence of mitigating and aggravating factors. *Hayes*, 102 N.C. App. at 781, 404 S.E.2d at 15. "In order to impose this aggravating factor, the sentencing judge must consider: (1) whether the weapon in its normal use is hazardous to the lives of more than one person; and (2) whether a great risk of death was knowingly created." *State v. Evans*, 120 N.C. App. 752, 758, 463 S.E.2d 830, 834 (1995).

First, defendant asserts that in finding that in its normal use the weapon "would normally be hazardous to the lives of more than one person" the trial court violated the rule that "[e]vidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation." N.C. Gen. Stat. § 15A-1340.16(d). Defendant argues that since it was necessary for the State to prove defendant used a firearm to be convicted of assault with a firearm, shooting into an occupied vehicle, and assault with intent to inflict serious bodily injury, therefore the trial court could not consider the use of the firearm as evidence to support an aggravating factor. We disagree. In order to prove the substantive crimes, the State needed to prove use of the firearm, but did not need to prove "that defendant employed a weapon normally hazardous to the lives of more than one person," as required for finding the aggravating factor. *State v. Platt*, 85 N.C. App. 220, 228, 354 S.E.2d 332, 336 (1987). The State proved that defendant utilized a semi-automatic pistol, which "in its normal use is hazardous to the lives of more than one person and is the type of weapon contemplated by [this statute]." *State v. Antoine*, 117 N.C. App. 549, 551, 451 S.E.2d 368, 370 (1995). Therefore, we hold additional evidence was required from the State to prove the existence of this aggravating factor, beyond that required for the offenses themselves, and the trial court did not violate N.C. Gen. Stat. § 15A-1340.16(d) in finding this factor.

Defendant next asserts this aggravating factor should not have been applied because he did not act "knowingly." Defendant asserts the testimony of four mental health experts proves that he did not

know right from wrong. In addressing whether a person has knowingly created the risk, the court asks whether a reasonable person would have recognized the danger. *State v. Carver*, 319 N.C. 665, 356 S.E.2d 349 (1987). While the burden rests on the State to prove the existence of an aggravating factor, "[e]very person is presumed sane and the 'burden of proving insanity is properly placed on the defendant.' " *Dorsey*, 135 N.C. App. at 118, 519 S.E.2d at 72 (quoting *State v. Leonard*, 296 N.C. 58, 64, 248 S.E.2d 853, 856 (1978)). "If evidence of insanity is offered by the defendant, even if un-controverted, the credibility of that testimony is for the jury." *Id.* The jury, here, found the evidence offered by the defendant was insufficient to conclude that defendant was insane and unable to distinguish right from wrong. Likewise the judge, in his determination at sentencing, rejected the expert testimony from the defense, and found that a reasonable person would have recognized that this conduct created a great risk of death to the lives of more than one person. Where, as here, the jury has found defendant's evidence regarding insanity lacking, we find there is sufficient evidence for a reasonable judge to find that, despite the expert testimony to the contrary, defendant acted "knowingly." Therefore, the trial court did not err in finding this aggravating factor.

[3] Defendant also asserts the trial court erred in finding that he was on pretrial release when he committed the crimes, an aggravating factor provided by N.C. Gen. Stat. § 15A-1340.16(d)(12). "The State bears the burden of proving by a preponderance of the evidence that an aggravating factor exists." N.C. Gen. Stat. § 15A-1340.16(a). "In order to be valid, an aggravating factor must be supported by sufficient evidence to allow a reasonable judge to find its existence by a preponderance of the evidence. The trial court should be permitted wide latitude, however, in arriving at the truth as to the existence of aggravating and mitigating factors, for it alone observes the demeanor of the witnesses and hears the testimony." *Hayes*, 102 N.C. App. at 781, 404 S.E.2d at 15 (citations omitted). The evidence must be "sufficient to incline a fair and impartial mind to one side of the issue rather than the other." *Black's Law Dictionary*, 1201 (7th ed. 1999).

In the case at bar, the only evidence to support the finding that defendant was on pretrial release at the time of the crime is the testimony of State Trooper Steven Bradley ("Trooper Bradley") that he arrested defendant two months before the shooting for driving while impaired, and defendant was released pending trial. The State argues

that since there was no evidence that defendant's charge had gone to trial, the State had therefore established that defendant was on pretrial release. We disagree. Proof of arrest and absence of proof that a trial occurred is not sufficient evidence to conclude defendant was on pretrial release. Therefore the State's evidence, standing alone, does not meet its burden of proving the existence of the aggravating factor by a preponderance of the evidence. We reverse the trial court's finding of this aggravated factor and remand for new sentencing.

### III. Sentencing Issue: Correction of Clerical Error

[4] Defendant asserts the trial court erred in failing to make the requisite finding that the aggravating factors outweighed the mitigating factors before sentencing defendant to an aggravated term for assault with a firearm on Officer Denny. The transcript reveals the trial court stated, "[t]he Court finds that the factors, factors in aggravation outweigh the factors in mitigation, and that an aggravated sentence is justified in the judgments to be entered." The form, however, leaves unchecked this important finding. From the transcript and the aggravated sentence imposed, it is clear that the court intended to have this box checked. Clerical errors are properly addressed with correction upon remand because of the importance that the records " 'speak the truth.' " *State v. Linemann*, 135 N.C. App. 734, 738, 522 S.E.2d 781, 784 (1999) (quoting *State v. Cannon*, 244 N.C. 399, 403, 94 S.E.2d 339, 342 (1956)). Accordingly, upon remand the trial court should correct the clerical error when it enters a new judgment.

### IV. Sentencing Error: Consecutive Sentences

[5] Defendant asserts the trial court erred in sentencing him to two consecutive terms for the crimes of assault with a firearm on a law enforcement officer and discharging a firearm into occupied property, both of which stemmed from the same action of shooting Officer Ray. Defendant asserts this violated his constitutional protections from double jeopardy.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution prohibits imposing multiple punishments for the same offense. *State v. Gardner*, 315 N.C. 444, 450, 340 S.E.2d 701, 706 (1986). "When the same act or transaction constitutes a violation of two criminal statutes, the test to determine whether there are two separate offenses is whether each statute requires proof of a fact which the other does not." *State v. Haynesworth*, 146 N.C. App. 523, 530-31, 553 S.E.2d 103, 109 (2001) (citing *Blockburger v. United*

*States*, 284 U.S. 299, 76 L.Ed. 306 (1932)). "The fact that each crime requires proof of an element which the other does not demonstrates the intent of the General Assembly to allow multiple punishments to be imposed for the separate crimes." *Haynesworth*, 146 N.C. App. at 531, 553 S.E.2d at 109.

The crime of assault with a firearm on a law enforcement officer in violation of N.C. Gen. Stat. § 14-34.5 requires an assault, with a firearm, upon a law enforcement officer who was then performing his duties. The crime of discharging a firearm into occupied property in violation of N.C. Gen. Stat. § 14-34.1 requires the willful or wanton discharge of a firearm, into property, then occupied. Since one crime requires proof of a law enforcement officer then performing his duties, and the other requires proof of willful and wanton discharging of a firearm into occupied property, different elements constitute each offense, and there is no double jeopardy.

We have examined defendant's remaining assignments of error and find them to be without merit.

No error in trial, remanded for re-sentencing.

Judge HUDSON concurs.

Judge WYNN concurs with a separate opinion.

WYNN, Judge, concurring,

On appeal, defendant argues "if this case does not call out for a directed verdict of [not guilty] by reason of insanity, then we might as well remove that defense from our jurisprudence." The majority relies on *State v. Dorsey* in holding that trial courts are precluded from entering a directed verdict for a defendant based on a claim of insanity. *State v. Dorsey*, 135 N.C. App. 116, 118, 519 S.E.2d 71, 72 (1999). Bound by the holding of *Dorsey*, the majority correctly resolves this assignment of error by summarily discussing the events supporting defendant's claim of insanity. I write separately to (1) point out additional facts in this case, and (2) respectfully request that our Supreme Court examine the application of the holding of this Court's opinion in *Dorsey* to this case.

The record on appeal shows that upon graduating from Southern High School in Graham, North Carolina, defendant entered the United States Air Force. For five years, until his mid-twenties, defendant did

not show any signs of mental health problems; defendant married, advanced to the rank of Sergeant, and lived a normal life.

In early 1997, defendant's mental health began a serious, rapid, and documented decline into a state of psychosis. Defendant became a "Born-Again Christian": One psychiatrist described defendant's faith as "more religious than a reasonable person." Over the next six months, Air Force records reveal defendant began experiencing a form of paranoia in which he felt discriminated against because of his Christianity. In June 1997, defendant "became fixated on the fact that he was the son of God"; believed "that by watching the weather channel, he could tell that the end of the world was coming"; and baptized himself in a military swimming pool.

When defendant's wife became exceedingly concerned at defendant's actions and beliefs, defendant called the military police reporting that his wife was crazy. When the military police arrived, defendant was in the front yard talking about religion, his hereditary relationship with God, and the end of the world. The military police took defendant to the hospital, where defendant was diagnosed as a psychotic. Defendant spent six weeks in the hospital and was placed on anti-psychotic medication. However, because it was defendant's first psychotic episode, "the doctors decided not to keep him on his medicine and just see how he [would] do." However, within one day of being back on the Air Force base, defendant hit two military officers, proclaimed he was the son of God, again, and was back in the hospital. After six months in and out of the hospital, "it became clear to the military that [defendant was psychotic]." Consequently the "[Air Force] decided to medically retire" defendant with a 30% mental disability rating. According to the testimony of Dr. Baroriak, a forensic psychiatrist employed by the State of North Carolina at Dorothea Dix Hospital, defendant "believed that he had been railroaded out of the Air Force, and that the issue of mental illness was used against him . . . [as] part of a plot."

After his honorable discharge from the military, defendant returned to North Carolina in November 1998 and moved back home residing with his mother, Mary Frances Walker, and his mother's husband, Timothy Walker. Defendant obtained employment at the Federal Bureau of Prison's facility in Butner. However, defendant was placed on administrative suspension after the nature of his military discharge was discovered. After a short while, defendant realized that "one of his main career goals . . . to be a correctional officer" was over. "[Defendant] thought he was [yet again] being railroaded out of

the Federal Bureau of Prisons, and that this was part of a conspiracy based on his religious beliefs."

Dr. Baroriak testified that "at this point [defendant] started experiencing [and] exhibiting psychotic symptoms." On 22 October 1999, Ms. Walker, defendant's mother, testified she began "to notice a great big difference" in defendant. Specifically, beginning on 22 October 1999, defendant stopped responding verbally, began staring off into space, was susceptible to spontaneous bouts of crying, and ceased sleeping at night. On the night of 27 October 1999, defendant watched the Atlanta Braves play the New York Yankees in the Major League Baseball World Series. "He thought the Yankees represented the white people, and the Braves represented people of color. And that the [Yankees] victory . . . was part of God's statement" that the rapture was coming. Accordingly, defendant created a plan wherein defendant would get shot by police while wearing a Department of Justice uniform, and defendant reasoned that this would "alert[] the world to all the injustices that would be obvious to anybody investigating . . . that these conspiracies had happened to [him]."

Later that night, Ms. Walker awoke and noticed defendant in the bathroom. Ms. Walker knocked on the door, and defendant emerged with "no expression on his face." At 1:30 a.m., Ms. Walker heard defendant's "car crank up . . . . [And] when [she] saw him again, it was over at the emergency room." As summarized by the majority, from his home defendant drove to the Pantry Convenience Store wearing a uniform with Department of Justice insignia and carrying two semi-automatic pistols. Defendant asked the Pantry Clerk to call a "law man." When the Graham Police arrived, defendant approached their squad car and said something in the following vein: "Do you think justice has been done in the world today?" Noticing defendant's bizarre behavior, and his gun, the police drew their weapons, asking defendant to put his weapon down. Defendant stated "I'm immortal," asked the officers if they believed in God, and, within seconds, defendant began shooting. Defendant repeatedly yelled that "he was the son of God and could not die." The incident lasted between three and four minutes until defendant was shot, handcuffed, and taken to the hospital.

Dr. Bruce Brian Hughes testified that he was the "on-call" psychiatrist for Alamance Regional Mental Health Authority on 28 October 1999. After the incident at the Pantry, Dr. Hughes was called-in to evaluate defendant's mental health. During the course of his interview, defendant "revealed to [Dr. Hughes] that he felt he was the son

of God, that he had a mission that evening . . . . He felt that he was immortal, and that . . . by drawing [gun] fire from . . . police officers and sustaining no injuries, he would show the world he was immortal, [and] the son of God here to redeem us." Based on interviews with defendant, defendant's family, and an analysis of his previous mental health problems, Dr. Hughes formed the opinion that defendant had a psychotic disorder which on 28 October 1999 prevented defendant from "know[ing] right from wrong."

Dr. Patricia Hahn, a forensic psychologist employed by the State of North Carolina at Dorothea Dix Hospital, testified that she gave defendant a mental evaluation in March 2000. Dr. Hahn testified that "one of [my] main tasks [at Dorothea Dix Hospital] is to determine whether somebody is malingering a mental illness" because "we have a lot of people . . . trying to fake [insanity]." Dr. Kahn arrived at the conclusion that defendant "was psychotic at the time" of the incident. Dr. Kahn concluded that defendant was not faking his mental illness. Moreover, Dr. Peter Baroriak, also employed by Dorothea Dix, testified that in his medical opinion "[defendant] thought he was . . . doing something morally right when he fired his weapon on October 28 . . . . [And that defendant's] psychotic episode . . . impaired his ability to know the difference between right and wrong."

Dr. Holly Rogers, a psychiatrist and professor employed by Duke University, testified that she diagnosed defendant with schizoaffective disorder—a combination of manic depression and schizophrenia. Based on an analysis of defendant's records, police reports, and extensive interviews, Dr. Rogers testified "with a reasonable medical certainty that [defendant's] mental illness was definitely interfering with his ability to know right from wrong" on 28 October 1999.

Although the State cross-examined the defendant's psychological and psychiatric experts, the State did not proffer any experts to contradict their testimony. At the close of the State's evidence, and at the close of all the evidence, the defendant made a motion to dismiss. Apparently, defendant argued that the State failed to produce sufficient evidence of intent, because the State did not contradict defendant's expert testimony regarding his inability to differentiate between right and wrong on 28 October 1999. The trial court denied the motion, and, today, we affirm this decision because of the precedent created by *State v. Dorsey*. Because I question this Court's holding in *Dorsey*, I urge the Supreme Court to accept defendant's probable request for discretionary review to re-examine that case and its application to the issue in this case.

**STATE v. SELLERS**

[155 N.C. App. 51 (2002)]

In *State v. Leonard,* our Supreme Court held that:

> The prosecution may assume, as the law does, that the defendant is sane. . . . If no evidence of insanity be offered, the presumption of sanity prevails. . . . Even if the evidence of insanity presented by the defendant is uncontradicted by the state, it is the defendant's burden to satisfy the jury of the existence of the defense. The credibility of the defense witnesses in this case was a proper matter for the jury. A diagnosis of mental illness by an expert is not in and of itself conclusive on the issue of insanity.

*State v. Leonard,* 296 N.C. 58, 65, 248 S.E.2d 853, 857 (1978). Subsequently, in *State v. Dorsey,* this Court held that "[i]f evidence of insanity is offered by the defendant, even if un-controverted, the credibility of that testimony is for the jury and thus precludes the entry of a directed verdict for defendant on insanity." *State v. Dorsey,* 135 N.C. App. 116, 118, 519 S.E.2d 71, 72 (1999). However, in announcing this principal, the *Dorsey* Court relied on *Bank v. Burnette,* 297 N.C. 524, 536-37, 256 S.E.2d 388, 395-96 (1979), in which our Supreme Court held that a directed verdict, for the party bearing the burden of proof, is proper when the credibility of the evidence is "manifest as a matter of law." Seemingly, the *Dorsey* court should have held that *Burnette* left open the possibility of a "directed verdict" for a defendant pleading not guilty by reason of insanity "*where the credibility of [the] movant's evidence [of insanity] is manifest as a matter of law.*" *Id.* at 537, 256 S.E.2d at 396 (emphasis in original). However, the *Dorsey* court went much further than *Burnette* and foreclosed the possibility of a directed verdict for a defendant on a claim of insanity.

Since I, like my colleagues who join in the majority opinion, am bound to follow the holding of *Dorsey,*[1] I respectfully request our Supreme Court to re-examine this Court's prior holding in *Dorsey* that a directed verdict is never permitted for the defendant on the issue of insanity. Indeed, the holdings of our Supreme Court in *Leonard* and *Burnette* indicate that a directed verdict should be permitted if the credibility of the insanity evidence is "manifest as a matter of law." For that reason, I respectfully request that our Supreme Court re-examine the underlying basis of *Dorsey,* and determine if the facts of the case *sub judice,* warrant a reconsideration of our opinion issued today.

---

1. *In the Matter of Appeal from Civil Penalty,* 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). ("Where a panel of the Court of Appeals has decided the same issue . . . a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").