An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-621

Filed 3 June 2026

Davidson County, No. 18CR053942-280

STATE OF NORTH CAROLINA

v.

GREGORY LAVERNE KENNEDY

Appeal by defendant from judgment entered 15 July 2024 by Judge V. Bradford Long in Davidson County Superior Court. Heard in the Court of Appeals 22 April 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Caden Williams Hayes, for the State.*
>
> *Cooley Law Office, by Craig M. Cooley, for the defendant-appellant.*

TYSON, Judge.

Gregory Lavern Kennedy ("Defendant") appeals from judgment entered upon a jury's verdict of guilty of first-degree murder. Our review discerns no error.

## I. Background

Wanda Taylor texted her sister, Sandra Taylor, to ask whether she could go to a party hosted by Defendant's cousin, which Sandra was attending in Charlotte.

Defendant and Sandra had been dating for several years and were engaged. Sandra told Wanda she could attend the party and texted her the address.

Wanda's and Sandra's sister, Katena Taylor, and her husband, Gary Harper, drove from Winston-Salem to Defendant's and Sandra's house in Lexington. Defendant drove Gary, Katena, and Sandra to the party. Wanda drove separately and arrived approximately thirty minutes after the others had.

The party had a bartender serving alcoholic drinks. Katena had approximately five vodka with pineapple juice cocktails. Defendant had between seven and ten alcoholic drinks, including mixed drinks, beer, and when "the bartender ran out of mixed drinks" Defendant then drank "straight liquor." The alcohol consumption "affected" Defendant's behavior.

Before midnight, Sandra and Wanda were talking in the front yard. One of Defendant's cousins "got too close" to Sandra and Wanda. Wanda told her "You in my space." Wanda asked Sandra "Why is this lady in my space?" Defendant overhead Wanda and became aggravated. He looked at Wanda and said, "In your space?"

Defendant, his cousin, and another partygoer went inside of the house. Wanda asked Sandra if she had done something wrong. Sandra replied to her that she had not done anything wrong. Sandra went inside the house "to let them know that [Wanda] didn't mean anything." An argument ensued. Defendant told Sandra to leave.

Sandra and Wanda left the party and walked to Gary's SUV. Katena joined

- 2 -

her sisters a few minutes later. Defendant also walked to and entered the vehicle. Wanda exited the vehicle and went to her own car. Gary came to the vehicle and began driving Sandra, Katena, and Defendant. Defendant was still agitated inside the car. Sandra and Katena both quickly exited of the vehicle and flagged down Wanda's vehicle and asked for a ride. Wanda drove Sandra and Katena to Sandra's and Defendant's house in Lexington. They arrived after midnight. After they arrived the three sisters watched television.

Gary called Katena and asked her to meet him at a nearby convenience store so they could go to another party. Katena left the house to attend the party with Gary. Defendant arrived home about thirty minutes later. Defendant showered, changed his clothes, and left. Defendant stated he "didn't want no drama[.]" Defendant called Sandra's grandson's phone which Sandra's daughter, Kendra, had access to, to ask if he could spend the night. Kendra lived up the street from Defendant and Sandra. No one answered the phone and Defendant did not want to ring the doorbell at such an hour to awaken Kendra's children. Defendant went to Midway to a friend's house who was having a card game.

Sandra offered for Wanda to spend the night at the house on the couch. Wanda agreed and slept on the sectional sofa in the living room. Sandra brought Wanda a blanket. Sandra and Wanda both went to sleep.

Defendant arrived back home at around 7:00 a.m. Sandra asserted Defendant "had an attitude" when he arrived home, stating "What y'all doing in my house?"

Defendant went to his and Sandra's bedroom and then into the kitchen. Defendant asked Sandra where his keys were, and she replied they "should be in the nightstand." Defendant could not locate them, so Sandra went into the bedroom and showed him his keys.

Defendant testified he was frustrated Wanda had slept on the couch, asserting when people slept over they slept in a bed in a bedroom not on the couch. Defendant stomped around the house and slammed the cabinet doors in the kitchen. Sandra asked Defendant why he was slamming the cabinets, to which Defendant replied, "Because I can." Defendant went into the bedroom and returned to the kitchen and began slamming the cabinet doors again.

Defendant testified he had told Wanda to get out of his house. Defendant testified he told Wanda, "You're not going to do that in my house." Defendant testified Wanda replied, "This ain't your MFing home" because her sister, Sandra, owned the home.

Sandra asked Defendant from the living room, "What's your problem?" Wanda chimed in "Bruh, I know you're not mad … about last night." Defendant replied, "F**k you." Wanda replied "F**k you." Defendant walked out of the kitchen and approached the couch where Sandra and Wanda were seated. Both stood up. Sandra asserted Defendant grabbed Wanda "by the neck and threw her up against the wall" causing the living room picture to fall off the wall. Defendant asserted he only grabbed Wanda by the arm. Sandra went to press the panic button on the alarm

system in the hallway, but it did not work. Sandra then ran to the garage and retrieved her key fob to her car and tried to activate the alarm, but it did not work either.

Sandra saw Wanda at the top of the stairs holding a steak knife from the butcher block in the kitchen. Sandra told Wanda they should leave and both of them went into the living room to get Wanda's belongings. Defendant went into the kitchen. Sandra told Defendant: "That's f**kded up, what you did. You shouldn't have never put your hand on my sister." Defendant replied, "You're right. I shouldn't have put my hands on her." Wanda then stated, "You right, you shouldn't have never put your hands on me. You shouldn't have never put your Godd**n hands on me, and my sister will never marry a drunk mother f**ker like you."

Sandra testified Defendant positioned himself next to the fireplace, between Wanda and the exit. Sandra slid beside Defendant and told Wanda to do the same. Defendant turned around and told Sandra, "you shut the f**k up." Sandra noticed the gun holster on Defendant's person for the first time. Sandra yelled, "What? You got a mother f**king gun?" Sandra noticed Defendant reach for his back pocket, pull out a pistol, hold it in the air above his head, then point the pistol at Wanda across the room. Defendant fired the pistol at Wanda. It struck Wanda in the lower neck, passed through her "right brachiocephalic trunk," and right lung, and exited through her back on the bottom right. The path of the bullet indicated Wanda was shot at a downward angle.

Sandra asked Defendant "Did you shoot her?  Did you mother f\*\*king shoot her?"  Sandra fled to a neighbor's house and called law enforcement.  Wanda "took three steps and fell."  Defendant did not attempt to administer aid nor call 911.

Officers arrived and conducted a safety sweep.  Davidson County Sheriff's Deputy James Hull observed "a handgun laying on this table to the right of" Defendant when he entered the living room.  To Defendant's left he saw Wanda lying on the floor with blood on her head and "around the wall."  Next to Wanda's left hand was a carving fork and a butcher knife."  Near Wanda's right hand was a cell phone and another butcher knife.  Detective Bobby Welch observed the carving fork and butcher knife near Wanda's left hand were perpendicular to each other which he concluded it was a "very odd" presentation.

Wanda did not immediately die from her injuries, but she was pronounced dead on the scene.  Defendant was detained and charged with first-degree murder.  The jury returned a verdict and convicted Defendant of first-degree murder.  Defendant was sentenced to life in prison without parole.  Defendant appeals.

## II.  Jurisdiction

Jurisdiction lies with this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a) (2025).

## III.  Issues

Defendant argues the trial court erred by denying his motion to dismiss because the State had failed to present substantial evidence of premeditation and

deliberation and also because the State failed to present substantial evidence proving he did not act in self-defense.

## IV. Defendant's Motion to Dismiss

## A. Standard of Review

"[T]he denial of a motion to dismiss for insufficiency of the evidence is a question of law reviewed de novo by the appellate court." *State v. Barnett*, 368 N.C. 710, 713, 782 S.E.2d 885, 888 (2016). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and quotation marks omitted).

This Court reviews whether sufficient evidence existed to support a criminal conviction by considering the evidence "in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *State v. Golder*, 374 N.C. 238, 250, 839 S.E.2d 782, 790 (2020) (citation and quotation marks omitted).

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015) (citation and internal quotation marks omitted).

"Evidence does not have to be irrefutable or uncontroverted to be substantial." *State v. Mitchell*, 240 N.C. App. 246, 254, 770 S.E.2d 740, 746 (2015) (citation

omitted). Substantial evidence "need only be such as would satisfy a reasonable mind as being adequate to support a conclusion." *State v. Butler*, 356 N.C. 141, 145, 567 S.E.2d 137, 139 (2002) (citation and internal quotation marks omitted). Whether substantial evidence has been presented requires us to "examine[] the sufficiency of the evidence presented but not its weight." *State v. McNeil*, 359 N.C. 800, 804, 617 S.E.2d 271, 274 (2005) (citation omitted). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992) (citation omitted).

## B. Premeditation and Deliberation

Defendant argues the State presented insufficient evidence for a jury to convict him of first-degree murder based upon premeditation and deliberation. Defendant asserts no substantial evidence tends to show Defendant premeditated Wanda's death, or he had shot her with a cool state of mind. Defendant asserts the most the State could possibly argue was he committed voluntary manslaughter because of imperfect self-defense.

Our Supreme Court has defined "premeditation" and "deliberation" as:

> thought beforehand for some length of time, however short. No particular length of time is required; it is sufficient if the process of premeditation occurred at any point prior to the killing. An unlawful killing is committed with deliberation if it is done in a cool state of blood, without legal provocation, and in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose. The intent to kill must arise from a fixed determination previously formed after weighing the

matter.

*State v. Corn*, 303 N.C. 293, 297, 278 S.E.2d 221, 223 (1981) (citations and internal quotation marks omitted).

Our Supreme Court also delineated several factors from which premeditation and deliberation may be inferred:

> (1) lack of provocation on the part of the deceased, (2) the conduct and statements of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill-will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Keel*, 337 N.C. 469, 489, 447 S.E.2d 748, 759 (1994) (citation and quotation marks omitted). Neither all nor any certain combination or factors is required and the presence of any one factor may be sufficient. *Id.*

Sandra testified Defendant had "grabbed [Wanda] by the neck and threw her up against the wall" with such force for a picture to be knocked off the wall. Defendant armed himself with the firearm from another room. When Wanda and Sandra were trying to leave the residence, he positioned himself between Wanda and the exit to prevent her leaving.

Defendant points to his testimony asserting Wanda had armed herself with sharp instruments from the kitchen to support his position. Defendant testified he felt he had to kill Wanda in self-defense. When asked, "[s]o you didn't get so mad

that you didn't have any ability to control yourself," Defendant responded, "I never got . . . over mad . . . My temper stayed the same. I was upset."

Defendant shot Wanda one time in a downward trajectory on her torso. He did not render aid nor seek help once Wanda was incapacitated. The evidence presented by the State was sufficient to withstand Defendant's motion to dismiss. The weight to be given the evidence admitted was for the jury to resolve. *Benson*, 331 N.C. at 525, 417 S.E.2d at 765 (citation omitted).

The jury was instructed on self-defense, imperfect self-defense, first-degree murder based on premeditation and deliberation, second-degree murder, and voluntary manslaughter. The jury heard the evidence and returned a verdict finding and concluding Defendant was guilty of first-degree murder based upon premeditation and deliberation. Defendant's argument is overruled.

**C. Self Defense**

Defendant argues the trial court erred in denying his motion to dismiss because the State had failed to present substantial evidence he did not act in self-defense.

Self-defense is an affirmative defense, whereby "the defendant says I did the act charged in the indictment, but I should not be found guilty of the crime charged because . . ." *State v. Caddell*, 287 N.C. 266, 289, 215 S.E.2d 348, 363 (1975) (quotation marks omitted); N.C. Gen. Stat. § 14-51.3 (2025). When self-defense is at issue, "[t]he burden is upon the State to prove beyond a reasonable doubt that the

defendant did not act in self-defense when there is some evidence in the case that he did." *State v. Herbin*, 298 N.C. 441, 445, 259 S.E.2d 263, 267 (1979).

"This Court may reverse the denial of a motion to dismiss based upon an affirmative defense only if the evidence in support of that affirmative defense is undisputed and does not require determination of a witness' credibility." *State v. Lockhart*, 181 N.C. App. 316, 321, 639 S.E.2d 5, 8 (2007) (citing *State v. Sellers*, 155 N.C. App. 51, 56, 574 S.E.2d 101, 105 (2002)).

The jury was properly instructed on self-defense, imperfect self-defense, first-degree murder based on premeditation and deliberation, and the lesser-included offenses of second-degree murder and voluntary manslaughter. The tension and contradictions between Sandra's and Defendant's testimonies for Defendant's affirmative defense and the State meeting its burden of proof were for the jury to decide. Defendant's argument is overruled.

## V. Conclusion

The State presented substantial evidence of premeditation and deliberation. Defendant did not produce "undisputed" evidence which "does not require the determination of a witness' credibility." *Id.* The trial court properly denied Defendant's motion to dismiss.

The trial court properly instructed the jury on self-defense, imperfect self-defense, first-degree murder based on premeditation and deliberation, and the lesser-included offenses of second-degree murder and voluntary manslaughter. Defendant

received a fair trial, free from prejudicial errors he preserved and argued.  We discern no error in the jury's verdicts or in the judgment entered thereon.  *It is so ordered.*

NO ERROR.

Judges COLLINS and GORE concur.

Report per Rule 30(e)